NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-4046

IN RE JUDICIAL CAMPAIGN COMPLAINT AGAINST O'TOOLE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Judicial Campaign Complaint Against O'Toole,* Slip Opinion No. 2014-Ohio-4046.]

*Judges—Judicial campaigns—Misconduct—Jud.Cond.R. 4.3(A) unconstitutional in part to extent it prohibits judicial candidate from knowingly or recklessly conveying information about candidate or candidate's opponent that, if true, would be deceiving or misleading to reasonable person— Offending language severed—Prohibition in Jud.Cond.R. 4.3(A) against conveying information concerning judicial candidate or opponent knowing information to be false is not overbroad restriction on speech and is not unconstitutionally vague—Candidate's misrepresentation that she was still a sitting judge violated Jud.Cond.R. 4.3(A)—Public reprimand.*

(No. 2012-1653—Submitted February 26, 2014—Decided September 24, 2014.)

APPEAL from the Order of the Judicial Commission of the Supreme Court.

_____

**SYLLABUS OF THE COURT**

1.  The portion of Jud.Cond.R. 4.3(A) that prohibits a judicial candidate from conveying information concerning the judicial candidate or an opponent knowing the information to be false is not an overbroad restriction on speech and is not unconstitutionally vague.

2.  The portion of Jud.Cond.R. 4.3(A) that prohibits a judicial candidate from knowingly or recklessly conveying information about the candidate or the candidate's opponent that, if true, would be deceiving or misleading to a reasonable person is unconstitutional as a violation of the First Amendment to the United States Constitution.

_____

**LANZINGER, J**.

**{¶ 1}** This disciplinary action was brought against respondent, Colleen Mary O'Toole of Concord, Ohio, Attorney Registration No. 0053652, who was admitted to the practice of law in Ohio in 1991. Pursuant to Gov.Jud.R. II(5)(D), a five-member judicial commission found that O'Toole violated Jud.Cond.R. 4.3(A) while she was a 2012 judicial candidate for the Eleventh District Court of Appeals. The rule prohibits a judicial candidate from knowingly or recklessly conveying information about the candidate or candidate's opponent that is false or that, if true, would deceive or mislead a reasonable person. O'Toole had previously served on the Eleventh District Court of Appeals from 2004 until 2011 but had been defeated for reelection in 2010 and was no longer an incumbent judge in 2012. Nevertheless, during the 2012 campaign she wore a name badge identifying herself as "Colleen Mary O'Toole, Judge, 11th District Court of Appeals" and referred to herself as "Judge O'Toole" on her campaign website. O'Toole defended her conduct on First Amendment grounds.

**{¶ 2}** For reasons that follow, we hold that the portion of Jud.Cond.R. 4.3(A) that prohibits a judicial candidate from conveying information concerning

the judicial candidate or an opponent knowing the information to be false is not an overbroad restriction on speech and is not unconstitutionally vague. We also hold that the portion of Jud.Cond.R. 4.3(A) that prohibits a judicial candidate from knowingly or recklessly conveying information about the candidate or the candidate's opponent that, if true, would be deceiving or misleading to a reasonable person is unconstitutional as a violation of the First Amendment to the United States Constitution. We therefore sever this portion of the rule and find that O'Toole committed one rather than two violations. We still agree with the commission that a public reprimand is appropriate, however, and affirm the commission's order in part.

## FACTS

{¶ 3} O'Toole was elected to the Eleventh District Court of Appeals of Ohio in 2004. She served until she was defeated in the May 2010 Republican primary and left the bench upon the expiration of her term in February 2011. In 2012, she sought another seat on the same appellate court and defeated an incumbent judge, Mary Jane Trapp, in the November 2012 general election. O'Toole began a new six-year term on the court on February 9, 2013.

{¶ 4} The complainant in this case, James B. Davis, filed a grievance with the Board of Commissioners on Grievances and Discipline against O'Toole in August 2012. He alleged that O'Toole had violated the Code of Judicial Conduct during her judicial campaign. Specifically, he alleged that certain campaign materials, including a photograph on the Ashtabula County Republican Party website of O'Toole wearing what appears to be a judicial robe, certain public statements, and a name tag that she wore to campaign events violated the prohibition against false or misleading statements under Jud.Cond.R. 4.3(A) and the prohibition against misrepresentations under former Jud.Cond.R. 4.3(F), now 4.3(G) (prohibiting a judicial candidate from misrepresenting the identity, qualifications, present position, or other fact of the candidate or the candidate's

opponent).[1]  He asserted that O'Toole's statements in these contexts were designed to mislead the voters to believe that she was an incumbent judge.

{¶ 5} O'Toole responded that the grievance should be dismissed on the grounds that Jud.Cond.R. 4.3 is unconstitutional, both facially and as applied to her, because the rule violates the First and Fourteenth Amendments to the United States Constitution.  Nevertheless, a probable-cause panel of the board found that probable cause existed to file a complaint with respect to three of Davis's claims and certified them to the board.[2]  On instruction from the probable-cause panel, the secretary of the board prepared and certified a three-count formal complaint against O'Toole, and a panel of the board was appointed to hear the matter. O'Toole moved to dismiss the complaint, again arguing that Jud.Cond.R. 4.3(A) and (F) are unconstitutional.  That motion was denied.

{¶ 6} At a hearing on September 18, 2012, the panel took testimony from O'Toole, the complainant, and three additional witnesses and received 26 exhibits. The panel found that there was insufficient evidence that O'Toole had posted, published, circulated, or distributed the challenged materials that appeared on the Ashtabula County Republican Party website and therefore recommended that the first count of the complaint that alleged a violation of Jud.Cond.R. 4.3(F) be dismissed.

{¶ 7} The panel did find, however, that O'Toole had violated Jud.Cond.R. 4.3(A) in the two remaining counts.  With respect to Count Two, the panel found that O'Toole violated Jud.Cond.R. 4.3(A) by posting misleading statements on her campaign website about herself and her previous term on the Eleventh District Court of Appeals worded to give the impression that she was an incumbent judge.

---

[1] Former Jud.Cond.R. 4.3(F) is found at 120 Ohio St.3d XCVIII, 83, effective March 1, 2009. Effective January 1, 2013, we amended the Code of Judicial Conduct, and the provision of Jud.Cond.R. 4.3(F) discussed above is now designated Jud.Cond.R. 4.3(G).  133 Ohio St.3d LXXXIII, LXXXIV.

[2] The panel dismissed nine additional claims that are not relevant here.

And with respect to Count Three, the panel determined that the badge O'Toole wore during her campaign and at the hearing that read "Colleen Mary O'Toole, Judge, 11th District Court of Appeals" would lead a reasonable person to believe that she was still a sitting judge. The panel also expressed great concern that O'Toole had insisted, even at her disciplinary hearing, that she remained a judge despite the fact that she had lost her bid for reelection and her term had ended.

{¶ 8} The panel recommended that O'Toole be ordered to pay a fine of $1,000, the costs of the proceedings, and $2,500 of the reasonable and necessary attorney fees that the complainant incurred in bringing his grievance and prosecuting the formal complaint. The panel further recommended that she be ordered to modify her website to include the date that her service as a judge ended, to remove any reference to herself as "Judge O'Toole" from the website, and to stop wearing the name badge identifying herself as a judge.

{¶ 9} A five-judge commission appointed by this court pursuant to Gov.Jud.R. II(5)(D) reviewed the panel's report and issued an interim order that O'Toole immediately cease and desist from referring to herself as "Judge O'Toole" on her website, www.otooleforjudge.com, that she add to her website the date that her judicial service ended, and that she cease and desist from wearing the challenged name badge or any other name badge that identified her as a judge. *In re Judicial Campaign Complaint Against O'Toole,* 133 Ohio St.3d 1405, 2012-Ohio-4635, 975 N.E.2d 1025.

{¶ 10} O'Toole objected to the panel's report, renewing her constitutional challenges to Jud.Cond.R. 4.3(A), alleging that there was insufficient evidence to prove that her statements were untrue, deceptive, or misleading to a reasonable person and arguing that the panel's recommendation regarding the payment of $2,500 toward the complainant's attorney fees was arbitrary and capricious. The commission, however, found that O'Toole's objections were not well taken and concluded that the panel had not abused its discretion, because the record

supported its findings that O'Toole had violated Jud.Cond.R. 4.3(A) with respect to Counts Two and Three of the complaint.[3] *See* Gov.Jud.R. II(5)(D)(1). Based on these findings, the commission publicly reprimanded O'Toole, fined her $1,000, and ordered her to pay the costs of the proceedings and $2,500 of the reasonable and necessary attorney fees of complainant James B. Davis. *Id.*

{¶ 11} Pursuant to Gov.Jud.R. II(5)(E), O'Toole now appeals the sanction to us, alleging that Jud.Cond.R. 4.3(A) violates the First and Fourteenth Amendments to the United States Constitution, both on its face and as applied to her, and that the rule is overbroad and vague. Alternatively, she argues that the sanctions imposed by the commission are the result of passion and prejudice, that they are unsupported by the record, and that they should therefore be reversed by this court.

{¶ 12} O'Toole also filed a motion to stay the sanctions imposed against her. We granted the motion in part and stayed the five-judge commission's order that she pay a $1,000 fine, $2,530.82 in costs, and $2,500 in attorney fees pending our disposition of her appeal. *In re Judicial Campaign Complaint Against O'Toole*, 133 Ohio St.3d 1481, 2012-Ohio-5282, 978 N.E.2d 206.

## CONSTITUTIONALITY OF JUD.COND.R. 4.3(A)

{¶ 13} O'Toole challenges Jud.Cond.R. 4.3(A) on its face, arguing that it does not satisfy strict scrutiny, that it is overbroad, and that it is unconstitutionally vague.

{¶ 14} This court has exclusive authority to regulate the practice of law in Ohio. *See* Ohio Constitution, Article IV, Sections 2(B)(1)(g) and 5(B); *Melling v. Stralka*, 12 Ohio St.3d 105, 107, 465 N.E.2d 857 (1984). Pursuant to that authority, we promulgated the Ohio Code of Judicial Conduct. The code "establishes standards for the ethical conduct of judges and judicial candidates"

---

[3] Although the panel had only recommended that Count One be dismissed, the commission found that the panel had, in fact, dismissed the count.

and "provide[s] a basis for regulating their conduct through disciplinary agencies." Jud.Cond.R., Preamble [3]; *see id.*, Application 1(A) (only Canon 4 applies to judicial candidates). It is intended "to provide guidance" and to "assist judges in maintaining the highest standards of judicial and personal conduct." *Id.*

{¶ 15} Before evaluating O'Toole's conduct, we must resolve her constitutional challenge to Jud.Cond.R. 4.3 by examining its language. *See United States v. Williams*, 553 U.S. 285, 293, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) ("it is impossible to determine whether a statute reaches too far without first knowing what the statute covers"); *Republican Party of Minnesota v. White*, 536 U.S. 765, 770, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) ("Before considering the constitutionality of the * * * clause, we must be clear about its meaning"). As the body that promulgated the rule, this court is certainly able to construe its meaning.

{¶ 16} Jud.Cond.R. 4.3 sets forth standards and rules for communications by judicial candidates during a campaign for nomination or election to judicial office. Sections (A) through (N) of the rule each prohibit a specific type of conduct during a campaign. O'Toole's case focuses on section (A), which limits the circumstances under which a judicial candidate may distribute false information or true information that is misleading:

> During the course of any campaign for nomination or election to judicial office, a judicial candidate, by means of campaign materials, including sample ballots, advertisements on radio or television or in a newspaper or periodical, electronic communications, a public speech, press release, or otherwise, shall not knowingly or with reckless disregard do any of the following:
>
> (A) Post, publish, broadcast, transmit, circulate, or distribute information concerning the judicial candidate or an opponent, either knowing the information to be false or with a

reckless disregard of whether or not it was false or, if true, that would be deceiving or misleading to a reasonable person.

{¶ 17} By its own terms, then, section (A) restricts two categories of speech by judicial candidates such as O'Toole: (1) speech conveying *false* information about the candidate or her opponent and (2) speech conveying *true* information about the candidate or her opponent *that nonetheless would deceive or mislead* a reasonable person.

{¶ 18} The rule also restricts speech under limited circumstances. First, the speech must be during a specific time period, i.e., "[d]uring the course of any campaign for nomination or election to judicial office." Second, the speech must occur "by means of campaign materials, including sample ballots, advertisements on radio or television or in a newspaper or periodical, electronic communications, a public speech, press release, or otherwise." And, finally, the speaker must have acted with a specific mens rea, either knowingly or with reckless disregard.[4]

*Strict Scrutiny for Content-Based Rules*

{¶ 19} As a general matter, government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002). Thus, "content-based restrictions on speech [are] presumed invalid" and "the Government bear[s] the burden of showing their constitutionality." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 660, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004).

{¶ 20} Jud.Cond.R. 4.3(A) prohibits false speech of judicial candidates as well as true speech that is nevertheless misleading. As such, the rule is a content-

---

[4] Jud.Cond.R. 4.3 imposes a general mens rea requirement with respect to all conduct listed in sections (A) through (N): a judicial candidate "shall not knowingly or with reckless disregard do any of the following * * *." This mens rea applies to each element of the enumerated offenses.

based regulation. Because the speech it regulates is protected by the First Amendment, there is a presumption of unconstitutionality that must be overcome. Accordingly, we examine the rule under a standard of strict scrutiny. *Sable Communications of California, Inc. v. Fed. Communications Comm.,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). This standard of review places a heavy burden on the government to show that there is a compelling state interest for the regulation. *Brown v. Entertainment Merchants Assn.,* 564 U.S. ___, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011). The rule must also be shown to be "the least restrictive means among available, effective alternatives" of furthering that interest. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); *United States v. Playboy Entertainment Group*, *Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

{¶ 21} In applying strict scrutiny to Jud.Cond.R. 4.3(A), we hold that the state has a compelling government interest in ensuring truthful judicial candidates but that the rule is not narrowly tailored to meet its purpose, because it overreaches to speech that is true but that would be deceiving or misleading to a reasonable person.

*Compelling government interest*

{¶ 22} The Code of Judicial Conduct as a whole is premised on our recognition that the judicial branch of government differs from the legislative and executive branches of government in fundamental ways. "Unlike the other branches of government, the authority of the judiciary turns almost exclusively on its credibility and the respect warranted by its rulings." *Cary v. Wolnitzek*, 614 F.3d 189, 194 (6th Cir.2010). Judicial office is a public trust, and the system depends on the integrity of its participants. *In re Judicial Campaign Grievance Against O'Neill,* 132 Ohio St.3d 1472, 2012-Ohio-3223, 970 N.E.2d 973. Accordingly, the public interest is served not only by ensuring that Ohio's judges are trustworthy, but also by promoting a collective public awareness of that

trustworthiness. *In re Chmura*, 461 Mich. 517, 536, 608 N.W.2d 31 (2000) ("The state's interest in the integrity of the judiciary extends to preserving public confidence in the judiciary. The appearance of fairness and impartiality is necessary to foster the people's willingness to accept and follow court orders").

{¶ 23} To this end, the code expressly articulates two overarching state interests. First, Ohio seeks to promote and maintain "[a]n independent, fair, and impartial judiciary" as "indispensable to our system of justice." Jud.Cond.R., Preamble [1]. Second, Ohio strives to ensure "the greatest possible public confidence in [the] independence, impartiality, integrity, and competence" of judges, Preamble [2], and of judicial candidates,[5] Preamble [3].

{¶ 24} The code also expresses these interests in the context of judicial campaigns. Canon Four prohibits judges and judicial candidates from "engag[ing] in political or campaign activity that is inconsistent with the independence, integrity, or impartiality of the judiciary." O'Toole relies on comment [1] to Jud.Cond.R. 4.3 as "the stated public-policy purpose" of the rule. The comment states: "This rule obligates the candidate and the [candidate's campaign] committee to refrain from making statements that are false or misleading or that omit facts necessary to make the communication considered as a whole not materially misleading." But this sentence is nothing more than a summary and does not set forth the reason behind the rule.

{¶ 25} A comment to Jud.Cond.R. 4.1 is more telling and states that "[c]ampaigns for judicial office must be conducted differently from campaigns for other offices so as to foster and enhance respect and confidence for the judiciary. Judicial candidates have a special obligation to ensure the judicial system is viewed as fair, impartial, and free from partisanship." Jud.Cond.R. 4.1, comment

---

[5] "Integrity" is defined as "probity, fairness, honesty, uprightness, and soundness of character." Jud.Cond.R., Terminology.

[8]. Thus, the rules in Canon 4, including those that relate to speech in Jud.Cond.R. 4.3(A), are intended to ensure that judges and judicial candidates campaign in a way that fosters and enhances respect for, and confidence in, the judiciary.

{¶ 26} We determine, as have other courts, that these interests are compelling. "There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 848, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978). "[J]udicial integrity is * * * a state interest of the highest order," *White,* 536 U.S. at 793, 122 S.Ct. 2528, 153 L.Ed.2d 694 (Kennedy, J., concurring), as is public confidence in the judiciary. *See, e.g., In re Chmura*, 461 Mich. at 433, 608 N.W.2d 31; *Butler v. Alabama Judicial Inquiry Comm.*, 111 F.Supp.2d 1224, 1233 (M.D.Ala.2000) ("it is not disputed that preserving the integrity of the judiciary is a compelling state interest"); *Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir.2002) (interests such as preserving integrity, impartiality, and independence of judiciary "may be compelling"). We agree with these sentiments. Ohio has a compelling interest in ensuring that "judicial campaigns are run in a manner so as not to damage the actual and perceived integrity of state judges and the bar." *Berger v. Supreme Court of Ohio*, 598 F.Supp. 69, 75 (S.D.Ohio 1984).

{¶ 27} O'Toole attempts to show that these interests are insufficient to pass strict scrutiny by citing two United States Supreme Court decisions: *United States v. Alvarez,* 567 U.S. ___, 132 S.Ct. 2537, 2544, 183 L.Ed.2d 574 (2012), and *White*. First, she implies that *White* foreclosed the possibility that any state interest could justify regulating judicial elections differently from other elections. But she is wrong to claim that *White* put judicial elections on the same footing as other elections, because the *White* court expressly denied having decided that question. "[W]e neither assert nor imply that the First Amendment requires campaigns for judicial office to sound the same as those for legislative office.

What we do assert * * * is that, *even if* the First Amendment allows greater regulation of judicial election campaigns than legislative election campaigns," the regulation under review in that case would still not survive strict scrutiny. (Footnote omitted and emphasis sic.) *Id.* at 783.

{¶ 28} Second, O'Toole says that *Alvarez* supports her claim that the state has no compelling interest in preventing either false speech or true but misleading speech in judicial elections. According to O'Toole, *Alvarez* held that "the state has no constitutionally cognizable interest in prohibiting or punishing even false speech, much less * * * truthful but misleading, or potentially misleading speech." But *Alvarez* said no such thing. Instead, the *Alvarez* court held that content-based restrictions permitted for certain categories of expression, such as obscenity and defamation, are not permitted for speech that is merely false. *Alvarez* at 2544. *Alvarez* does not consider whether the state can *ever* have a compelling interest in restricting false speech solely on the basis that it is false so that such prohibition could withstand strict scrutiny.

{¶ 29} We determine that neither *White* nor *Alvarez* forces us to reject the compelling interests identified in our Code of Judicial Conduct as justification for its regulation of certain speech. Ohio has a compelling interest in promoting and maintaining an independent judiciary, ensuring public confidence in the independence, impartiality, integrity, and competence of judges, and ensuring that the conduct of judicial candidates furthers, rather than impairs, these interests. There is every reason to expect and insist that candidates will be truthful in their campaign speech when they are seeking a judicial position.

*Overbreadth of Jud.Cond.R. 4.3(A)*

{¶ 30} Having identified compelling interests for Jud.Cond.R. 4.3(A), we next consider whether the rule is overbroad. To survive an overbreadth challenge, the rule not only must be narrowly tailored to achieve these interests but must use the least restrictive means of achieving these interests. When a rule is not

narrowly tailored, it " 'unnecessarily circumscribe[s] protected expression.' " *White,* 536 U.S. at 775, 122 S.Ct. 2528, 153 L.Ed.2d 694, quoting *Brown v. Hartlage*, 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982). The rule must also use the least restrictive means among available, effective alternatives. *Alvarez,* 567 U.S. ___, 132 S.Ct. at 2551, 183 L.Ed.2d 574.

{¶ 31} Although there is precedent in other jurisdictions holding that the regulation of false judicial campaign speech is constitutional, we have found no other jurisdiction that extends its regulation to the truthful but misleading speech of judicial candidates. In fact, the Supreme Courts of Michigan and Alabama have held rules comparable to Jud.Cond.R. 4.3(A) to be unconstitutionally overbroad on this point. *In re Chmura*, 461 Mich. 517, 608 N.W.2d 31; *Butler v. Alabama Judicial Inquiry Comm.*, 802 So.2d 207, 215-218 (Ala.2001). To render their rules constitutional, those courts have narrowly interpreted them by (1) requiring that a judicial candidate act with a specific mens rea before a violation can be found and (2) eliminating the portions that purported to regulate true but misleading speech. *Chmura* at 541; *Butler* at 215-218.

*Other State Cases*

{¶ 32} In *Chmura*, the Supreme Court of Michigan considered a facial challenge to the constitutionality of Canon (7)(B)(1)(d) of the Michigan Code of Judicial Conduct, which provided at that time that a candidate for judicial office

> should not use or participate in the use of any form of public communication that the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially misleading, or which is likely to create an unjustified expectation about the results the candidate can achieve.

{¶ 33} Although the court found that the state had a compelling interest in preserving the integrity of the judiciary, *Chmura* at 534, it found that the rule was overbroad and chilled debate regarding the qualifications of candidates for judicial office because it (1) applied to all statements, not just those bearing on the impartiality of the judiciary, (2) imposed adverse consequences not just for false statements, but also for those that were found to be deceptive or misleading, and (3) extended beyond the candidate's statements by permitting discipline for a candidate's factual omissions. *Chmura* at 539.

{¶ 34} The Michigan Supreme Court narrowed the rule's meaning to prohibit a candidate for judicial office from knowingly or recklessly using or participating in the use of any form of public communication that is "false." *Chmura* at 541. The court rejected the subjective "actual malice" standard employed in public-figure defamation cases, *id.* at 542, in favor of an objective standard that permits a candidate to freely exercise First Amendment rights and make statements that are "supported by a reasonable factual basis, even if the candidate turns out to be mistaken." *Id. at* 544.

{¶ 35} The Supreme Court of Alabama ruled similarly. In *Butler*, 802 So.2d 207, the Alabama Judicial Inquiry Committee charged an associate justice of that court with ethics violations for distributing false and misleading information against his opponent in the primary election in violation of the Alabama Canons of Judicial Ethics. The justice brought an action against the committee in the United States District Court for the Middle District of Alabama, alleging that those judicial canons violated the First Amendment. The federal district court granted the justice's motions for a temporary restraining order and preliminary injunction because there was a substantial likelihood that the justice would prevail on his constitutional claim. *Butler v. Alabama Judicial Inquiry Comm.*, 111 F.Supp.2d 1224, 1234-1239 (M.D.Ala.2000). On appeal, the United

States Court of Appeals for the Eleventh Circuit certified three questions to the Supreme Court of Alabama and invited the court to consider whether the challenged canons violated the First Amendment's guarantee of free speech. *Butler v. Alabama Judicial Inquiry Comm.,* 245 F.3d 1257, 1265-1266 (11th Cir.2001).

{¶ 36} At the relevant time, Canon 7B(2) of the Alabama Canons of Judicial Ethics provided:

> *Campaign Communications.* During the course of any campaign for nomination or election to judicial office, a candidate shall not, by any means, do any of the following:
>
> Post, publish, broadcast, transmit, circulate, or distribute false information concerning a judicial candidate or an opponent, either knowing the information to be false or with reckless disregard of whether the information is false; or post, publish, broadcast, transmit, circulate, or distribute true information about a judicial candidate or an opponent that would be deceiving or misleading to a reasonable person.

The Supreme Court of Alabama declared that the canon was unconstitutionally overbroad on its face, 802 So.2d at 213, approving the *Chmura* rationale and the reasoning advanced by the federal district court in granting the justice's motions for a TRO and preliminary injunction. 802 So.2d at 217-218.

{¶ 37} Both the Supreme Court of Alabama and the federal district court held that the canon chilled protected speech because the canon's prohibition of "deceiving or misleading" information did not take into account the candidate's intent or contain a falsity requirement and left a candidate subject to charges if a "reasonable person" would deem true information either "deceiving or

misleading." *Id.* at 217, quoting *Butler,* 111 F.Supp.2d at 1234-1236. To remedy the constitutional defect, the Supreme Court eliminated the language proscribing negligent misstatements and misleading true statements and narrowly construed the canon to prohibit judicial candidates from disseminating demonstrably false information concerning a judicial candidate or an opponent with actual malice, i.e., with knowledge that it is false or with reckless disregard of whether it is false or not. 802 So.2d at 218.

{¶ 38} Likewise, in *Weaver v. Bonner*, 309 F.3d 1312 (11th Cir.2002), the Eleventh Circuit Court of Appeals addressed the constitutionality of Canon 7(B)(1)(d) of the Georgia Code of Judicial Conduct, which provided that candidates for any judicial office filled by public election

shall not use or participate in the use of any form of public communication which the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation of fact or law or omits a fact necessary to make the communication considered as a whole not materially misleading or which is likely to create an unjustified expectation about results the candidate can achieve.

{¶ 39} The Eleventh Circuit Court of Appeals held that the state had a compelling interest in " 'preserving the integrity, impartiality, and independence of the judiciary' and 'ensuring the integrity of the electoral process and protecting voters from confusion and undue influence.' " *Id.* at 1319, quoting from the state appellees' brief. But it also held that the rule was not narrowly tailored, because it prohibited false statements negligently made and true statements that were misleading or deceptive and, therefore, did not afford the requisite "breathing space" to protected speech. *Id.* The court held that to be narrowly tailored,

restrictions on judicial campaign speech "must be limited to false statements that are made with knowledge of falsity or with reckless disregard as to whether the statement is false." *Id.,* citing *Brown v. Hartlage*, 456 U.S. 45, 61-62, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982). Because Canon 7(B)(1)(d) of the Georgia Code of Judicial Conduct was not so limited, the court held that it was unconstitutional. *Weaver* at 1321.

{¶ 40} While *Chmura*, *Butler*, and *Weaver* are not binding on this court, their holdings are of assistance nonetheless.

{¶ 41} We therefore look at the breadth of Jud.Cond.R. 4.3(A) to determine whether it is tailored to serve Ohio's compelling interests. We recognize that " 'erroneous statement[s] [are] inevitable in free debate, and * * * must be protected if the freedoms of expression are to have the "breathing space" they "need * * * to survive." ' " *Brown v. Hartlage* at 60, quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 271-272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), quoting *Natl. Assn. for Advancement of Colored People v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). But this general admonition does not apply to *intentional* or *reckless* erroneous statements because intentional lying is *not* inevitable in free debate. Lies do not contribute to a robust political atmosphere, and "demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements." *Brown v. Hartlage* at 60. The portion of Jud.Cond.R. 4.3(A) that limits a judicial candidate's *false* speech made during a specific time period (the campaign), conveyed by specific means (ads, sample ballots, etc.), disseminated with a specific mental state (knowingly or with reckless disregard) and with a specific mental state as to the information's accuracy (with knowledge of its falsity or with reckless disregard as to its truth or falsity) is constitutional. That portion of the rule applies to specific communications made by judicial candidates under narrowly defined circumstances.

**{¶ 42}** However, the latter clause of Jud.Cond.R. 4.3(A) prohibiting the dissemination of information that "if true," "would be deceiving or misleading to a reasonable person" is unconstitutional because it chills the exercise of legitimate First Amendment rights. This portion of the rule does not leave room for innocent misstatements or for honest, truthful statements made in good faith but that could deceive some listeners. The language requires candidates to "attempt to determine whether a reasonable person would view their speech as somehow misleading or deceptive." *Weaver v. Bonner,* 114 F.Supp.2d at 1342-1343. As a result, candidates will often choose to avoid adverse action by remaining silent even when they have good reason to believe that what they want to say is truthful. *Id.* at 1343.

**{¶ 43}** This "dramatic chilling effect" cannot be justified by Ohio's interest in maintaining a competent and impartial judiciary. *Weaver v. Bonner,* 309 F.3d at 1320. Accordingly, we hold that Jud.Cond.R. 4.3(A) is unconstitutional in part.

*Severance remedy*

**{¶ 44}** As noted above, we promulgated the Code of Judicial Conduct pursuant to our authority to regulate "all * * * matters relating to the practice of law" within the state. Ohio Constitution, Article IV, Sections 2(B)(1)(g) and 5(B). Under that same authority, we now narrow Jud.Cond.R. 4.3(A) to provide that no candidate for judicial office shall knowingly or with reckless disregard do any of the following: "Post, publish, broadcast, transmit, circulate, or distribute information concerning the judicial candidate or an opponent, either knowing the information to be false or with a reckless disregard of whether or not it was false." The remaining language in Jud.Cond.R. 4.3(A), "or, if true, that would be deceiving or misleading to a reasonable person," is severed.

**{¶ 45}** Limiting the reach of Jud.Cond.R. 4.3(A) in this manner narrowly tailors the rule so that it serves the state's compelling interests in promoting and

maintaining an independent judiciary, ensuring public confidence in the independence, impartiality, integrity, and competence of judges, and ensuring that the conduct of judicial candidates furthers, rather than impairs, these interests, while preserving the necessary "breathing space" for protected speech. *Weaver v. Bonner,* 309 F.3d at 1319.

## MISCONDUCT

{¶ 46} We next address O'Toole's argument that Jud.Cond.R. 4.3(A) is unconstitutional as applied to her speech in this case because she has been punished for "speech that was not false, and [that] cannot even be considered misleading as to a reasonable person."

{¶ 47} There is clear and convincing evidence that O'Toole committed one violation of Jud.Cond.R. 4.3(A) in claiming to be a judge when she was not, a misrepresentation that she knew was patently false.

*Count Three—the Badge*

{¶ 48} Count Three of the complaint challenges O'Toole's practice of wearing a name badge that identified her as a judge during campaign events. The name badge at issue is gold-colored plastic, approximately 3.5 inches by 1.5 inches, with engraved black lettering that states:

COLLEEN MARY O'TOOLE

JUDGE

11TH DISTRICT COURT OF APPEALS

{¶ 49} At the panel hearing, O'Toole testified that the badge was made for her when she was a sitting judge. She also testified at length that she believed that she continued to be a judge even after the expiration of her term in 2011, after losing the 2010 primary election. According to O'Toole, this belief stemmed in part from the fact that people continued to call her "judge" after she left the bench.

{¶ 50} We find that O'Toole was not a judge in 2012 and that she knew she was not a judge. Members of the public and the legal community may have continued to refer to her as "judge" as a matter of courtesy in recognition of her past service, but there is no question that she was defeated and that her term ended before her judicial campaign in 2012.

{¶ 51} O'Toole argues that she was still "a" judge, just not a "sitting judge." But Ohio law makes no such distinction. And O'Toole knew that she no longer had a courtroom, a docket, or any judicial authority. Indeed, in contrast to the judge in *O'Neill*, the case she cites, O'Toole was not retired. She was not even eligible to receive referrals of civil cases pursuant to R.C. 2701.10(A) or to be appointed to sit as a judge by assignment pursuant to Article IV, Section 6(C) of the Ohio Constitution because she had been defeated in her reelection bid. *See O'Neill*, 132 Ohio St.3d at 1474, 2012-Ohio-3223, 970 N.E.2d 973.

{¶ 52} In spite of all this, O'Toole continued to wear the name badge proclaiming that she was a judge at campaign events and even *at the panel hearing* on this matter. O'Toole relies on *O'Neill,* but unlike the brochure in that case, the name badge did not identify O'Toole as a former judge. O'Toole testified that she also wore, below the challenged name badge, a separate paper name badge that stated, "O'Toole for Judge. Paid for by Diane Goss, Treasurer." According to O'Toole, she intended this separate paper name badge to convey that she was a candidate for the office. But nothing in the text of that paper served to diminish or negate the false statement of incumbency on the engraved name badge above it.

{¶ 53} This intentional misrepresentation is not protected speech under the First Amendment. By repeatedly calling herself a judge when she was not, O'Toole undermined public confidence in the judiciary as a whole. Such misconduct injures both the public and the judiciary from the moment the lie is uttered, and that injury cannot be undone with corrective speech. Under the

circumstances, we perceive no constitutional infirmity in the commission's application of Jud.Cond.R. 4.3 to this conduct.

*Count Two—the Website*

{¶ 54} Count Two of the complaint filed by the secretary of the board alleges that O'Toole knowingly or recklessly made false or misleading statements on her campaign website, stating that "Judge O'Toole" advocated for the Ohio Judicial Conference before the legislature on various occasions. O'Toole's campaign website further stated: "Colleen O'Toole was elected to the Eleventh District Court of Appeals in 2004. During her term, she has decided over 1500 cases and has authored over 500 opinions." The panel found that O'Toole gave the impression that she was still on the court by failing to state that her term had ended and that the second sentence referring to her decisions "is worded in such a manner as to reinforce the impression that she is still a sitting judge." The panel was not persuaded by O'Toole's claim that the final sentence on the challenged web page, which stated, "She is presently CEO of On Demand [I]nterpretation [S]ervices llc [sic]," was sufficient to put the public on notice that her judicial term had ended.

{¶ 55} The commission of judges agreed with the panel that a reasonable person would be deceived or misled into believing that O'Toole was a sitting judge. *In re Judicial Campaign Complaint Against O'Toole,* 133 Ohio St.3d 1427, 1428, 2012-Ohio-4920, 976 N.E.2d 916. As the commission explained, "respondent's testimony, together with her wearing the name badge in question to the hearing in this matter, leave little doubt that she intended the public to believe that she is a judge, when she is not." *Id.*

{¶ 56} This second allegation, that O'Toole violated Jud.Cond.R. 4.3(A) by carefully crafting her campaign website so that a reasonable reader would be misled into believing that she was an incumbent judge seeking reelection, however, does not stand in light of the narrowing of Jud.Cond.R. 4.3(A).

21

**{¶ 57}** We have found that Jud.Cond.R. 4.3 can be constitutionally applied to regulate O'Toole's blatantly false claims that she was a judge during her 2012 judicial campaign. However, because we have found unconstitutional the language in Jud.Cond.R. 4.3(A) regulating speech that "would be deceiving or misleading to a reasonable person," we must dismiss the campaign-website violation.

**{¶ 58}** With her misconduct regarding the badge in mind, we turn to the issue of sanctions.

## SANCTIONS

**{¶ 59}** In addition to challenging the constitutionality of Jud.Cond.R. 4.3(A), O'Toole argues that the sanctions imposed by the five-judge commission are too onerous in light of the offenses charged.

**{¶ 60}** If a five-judge commission concludes that the record supports the hearing panel's finding that a violation of Canon 4 of the Code of Judicial Conduct has occurred and there has been no abuse of discretion by the hearing panel, Gov.Jud.R. II(5)(D)(1) permits the commission to enter an order that includes one or more of the following sanctions against the respondent: (a) a disciplinary sanction, (b) an order enforceable by contempt of court that the respondent cease and desist from engaging in the offending conduct, (c) a fine, (d) an assessment of costs, (e) an assessment of the reasonable and necessary attorney fees incurred by the complainant in prosecuting the grievance.

**{¶ 61}** On an appeal of a commission's order of sanctions, our review is limited to whether the commission abused its discretion. *In re Judicial Campaign Complaint Against Moll*, 135 Ohio St.3d 156, 2012-Ohio-5674, 985 N.E.2d 436, ¶ 17. " 'A decision constitutes an abuse of discretion when it is unreasonable, arbitrary, or unconscionable.' " *Id.,* quoting *State ex rel. Ebbing v. Ricketts*, 133 Ohio St.3d 339, 2012-Ohio-4699, 978 N.E.2d 188, ¶ 13.

**{¶ 62}** In considering whether the commission abused its discretion in this case, we consider the purpose of sanctions.

**{¶ 63}** "[T]he primary purpose of disciplinary sanctions is not to punish the offender, but to protect the public." *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53.

**{¶ 64}** We have also found that these sanctions serve as a deterrent to similar violations by judicial candidates in future elections. *In re Judicial Campaign Complaint Against Brigner*, 89 Ohio St.3d 1460, 732 N.E.2d 994 (2000), citing *In re Judicial Campaign Complaint Against Morris*, 81 Ohio Misc.2d 64, 65, 675 N.E.2d 580 (1997). Perhaps particularly important here, we have recognized that sanctions inform the public of the self-regulating nature of the legal profession and enhance public confidence in the integrity of judicial proceedings. *See, e.g., In re Judicial Campaign Complaint Against Beery*, 2009-Ohio-113. We believe that the public's faith in the disciplinary proceedings against judges and judicial candidates is fostered by sanctions that reflect the unique injuries inflicted on the public by judges and judicial candidates who are not truthful in the information they disseminate. *In re Judicial Campaign Complaint Against Per Due*, 98 Ohio St.3d 1548, 2003-Ohio-2032, 787 N.E.2d 10 ("The purpose of sanctions is to inform other judicial candidates of the seriousness of such violations and to deter future similar misconduct. A sanction that may result in effective deterrence best serves the public interest and the profession").

**{¶ 65}** We affirm the commission's order in part, finding that O'Toole's conduct during her judicial campaign violated Jud.Cond.R. 4.3(A) in one respect. She knowingly wore a name badge that falsely proclaimed that she was a judge on the Eleventh District Court of Appeals when she was not.

**{¶ 66}** The next question is the appropriate sanction. The closest case for comparison is *Moll*, 135 Ohio St.3d 156, 2012-Ohio-5674, 985 N.E.2d 436.

{¶ 67} In *Moll*, the respondent knowingly circulated campaign literature that contained a photo of her wearing a judicial robe but did not have accompanying text to indicate whether she was a current or former judge or magistrate. The literature also listed her as "Magistrate, Guernsey County," without specifying that she was a former magistrate or designating her dates of service. Notably, Moll had included limiting language of this type with the same photo in other campaign materials. *Id.* at ¶ 13.

{¶ 68} We held that Moll had violated Jud.Cond.R. 4.3(A), (C), and (F), and we affirmed the commission's order that imposed a $1,000 fine and ordered her to pay the costs of the proceeding plus $2,500 of the complainant's attorney fees, which exceeded $21,000. *Id.* at ¶ 17-18.

{¶ 69} O'Toole criticizes Moll for calling herself a magistrate when it had been five years since she had held that position. But O'Toole fails to appreciate that she herself continued to use the title of judge more than a year after she was defeated in a primary election and her judicial term had expired. Moll's misconduct involved a knowing or reckless omission of limiting language in one flyer distributed by her campaign while O'Toole's misconduct was knowing, calculated, and continuous. Thus, O'Toole's conduct was more egregious than Moll's and arguably could support a sanction even greater than that imposed by the commission. We find no abuse of discretion in this case, for there is no evidence that the commission acted in an unreasonable, arbitrary, or unconscionable manner. We further find that the sanction will deter other judicial candidates from knowingly or recklessly disseminating false information during their judicial campaigns.

{¶ 70} Accordingly, we affirm the order of the commission publicly reprimanding O'Toole for her misconduct as charged in Count Three, but that portion of the order finding misconduct as charged in Count Two is reversed, and Count Two is dismissed. We lift the stay on the enforcement of monetary

sanctions and order O'Toole to pay the fine, costs, and attorney fees imposed by the five-judge commission within 30 days of the date of this order.

Order affirmed in part<br>and reversed in part.

O'CONNOR, C.J., and O'DONNELL, PRESTON, FRENCH, and FISCHER, JJ., concur.

PFEIFER, J., concurs in part and dissents in part.

VERNON L. PRESTON, J., of the Third Appellate District, sitting for KENNEDY, J.

PATRICK F. FISCHER, J., of the First Appellate District, sitting for O'NEILL, J.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 71} I concur in the majority's judgment to reverse, in part, the order of the commission. I dissent only as to the amount of the attorney-fees sanction.

{¶ 72} Colleen Mary O'Toole exercised her right to appeal the decision of the five-judge commission in this case, and this court today holds that the rule she was charged with violating, Jud.Cond.R. 4.3(A), is unconstitutional in part, knocking out one of the two violations the commission had found that O'Toole had committed. That is an important holding and a win for O'Toole. But even as the majority cuts in half the number of violations, it keeps in place the amount of attorney fees she must pay, the $2,500 recommended by the three-member hearing panel and affirmed by the five-judge commission on the basis of two violations. I would cut the attorney-fees sanction in half.

{¶ 73} The complainant is himself responsible for most of the attorney fees expended in this case. He originally filed a 12-count grievance against O'Toole. The three-member probable-cause panel dropped nine of those counts at the probable-cause stage. One of the three remaining counts that were litigated

at the panel hearing was dismissed by the panel after that hearing. Still another is dismissed by this court today. Would the case have even proceeded if the badge charge—the only legitimate charge in the complaint—had been the only one raised?

{¶ 74} Attorney fees were unnecessarily expended in this case. Three weeks before the grievance was filed in her case, the majority of a commission of 13 appellate judges found that Jud.Cond.R. 4.3(C) was unconstitutional as applied to then-Judge O'Neill in *In re Judicial Campaign Grievance Against O'Neill*, 132 Ohio St.3d 1472, 2012-Ohio-3223, 970 N.E.2d 973. Both this case and the *O'Neill* case involved the use of the term "judge," and O'Toole was right to argue that the activity protected in *O'Neill* should be protected in her case, even though the violation in her case was repackaged as a Jud.Cond.R. 4.3(A) violation. This court has found that O'Toole was right to contest the rule's constitutionality.

{¶ 75} I agree with the majority that O'Toole should not have worn the same name badge she had worn when she was a sitting appellate court judge. But as a violation of Jud.Cond.R. 4.3(A), that activity was not particularly egregious. At the time of the violation, O'Toole was a *former* judge, not a judge. But the word "Judge" on the badge is small—the "J" in the word measures about a quarter of an inch, and the rest of the letters in the word measure less than that, just over a sixth of an inch. A person would have to be in close proximity to O'Toole to even read the badge. Anyone who could read the badge would also be able to personally interact with O'Toole. There is no testimony that anyone ever heard O'Toole represent that she was currently sitting on the appellate bench at the time.

{¶ 76} Gov.Jud.R. 4.3, for the most part, prohibits certain statements in situations that ensure wide distribution. The rule, in its admittedly nonexhaustive list of examples, refers to methods of communication with a much wider distribution potential than a name on a badge, including "campaign materials, * * * advertisements on radio or television or in a newspaper or periodical,

electronic communications, a public speech, [or a ] press release * * *." Gov.Jud.R. 4.3(A) speaks of "post[ing], publish[ing], broadcast[ing], transmit[ting], circulat[ing], or distribut[ing] information concerning the judicial candidate or an opponent." Under a reading of Jud.Cond.R. 4.3(A) that stretches the rule to its limits, O'Toole, through means of her badge, a campaign material, transmitted to assorted people within a few feet of her the information that she was currently a judge. So the violation was not far-reaching or particularly damaging to her opponent.

**{¶ 77}** O'Toole has already paid a steep price, suffering public censure, which this court has determined today was only partly deserved. But that is the way of Gov.Jud.R. II(5)—the process moves quickly from the panel to the commission to this court, and the results—right or wrong—are publicized along the way. The Board of Commissioners on Grievances and Discipline received Davis's complaint letter on August 9, 2012. By October 6, 2012, the panel hearing was completed, a recommendation had been issued, and an article had appeared in the Cleveland Plain Dealer deriding O'Toole. The headline: "Even if it runs like a judge, it still may not be one." Larkin, http://www.cleveland.com/opinion/index.ssf/2012/10/if_it_runs_like_a_judge_it_sti.html (Oct. 6, 2012). After the five-judge commission ruled, a News-Herald headline read, "Appeals Court candidate Colleen O'Toole disciplined for campaign literature." Read, http://www.news-herald.com/general-news/20121025/appeals-court-candidate-colleen-otoole-disciplined-for-campaign-literature (Oct. 25, 2012). The Youngstown Vindicator also mentioned O'Toole's violations in an article about appellate court races. Runyan, *Judge races abound in Trumbull*, http://www.vindy.com/news/2012/oct/28/judge-races-abound-in-trumbull/ (Oct. 28, 2012). In the heat of the campaign for a spot on the Eleventh District Court of Appeals, O'Toole was repeatedly maligned in newspapers covering the district.

**{¶ 78}** And that is just as James B. Davis, the complainant, would have it, because he was working as the alter ego of O'Toole's opponent, Mary Jane Trapp. Davis, a longtime friend of Trapp and her husband, Mike Apicella, testified that Trapp and her husband "primarily drafted" the original grievance. He testified that since he had filed the grievance, his interactions with Trapp were "an almost constant process." He testified that Trapp and her husband selected the attorneys to be used in the case and that it was his expectation that he would be reimbursed for any attorney fees he would have to pay. Apicella had even driven him to the panel hearing. Trapp received an electoral advantage as the result of this case, much of it undeserved given today's outcome.

**{¶ 79}** The five-judge commission ordered O'Toole to pay $2,500 of the attorney fees of her political opponent, based on its conclusion that O'Toole had committed two violations. Since O'Toole did commit one violation, I would find that the five-judge commission did not abuse its discretion in imposing a sanction of attorney fees. However, since the commission found two violations when there was only one, I would order the award of attorney fees to be reduced to $1,250.

_____

Mary L. Cibella, for complainant.

Berkman, Gordon, Murray & DeVan, J. Michael Murray, and Raymond V. Vasvari Jr., for respondent.

_____